UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| MICKEY BLACKBURN and SHEILA BLACKBURN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| 3M COMPANY, | ) ) | |
| Defendant, | ) ) | No. 6:26-CV-7-REW-CJS |
| and | ) ) | |
| 3M COMPANY, | ) ) | OPINION & ORDER |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| WHITT MINING & ENGINEERING COMPANY, *et al.*, | ) ) ) | |
| Third-Party Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

About three years ago, Mickey and Sheila Blackburn (collectively, "Plaintiffs") filed the instant suit against 3M Company ("3M"), and others. *See* DE 1 (Complaint). Since then, the parties have thinned and completed discovery, and a date has been set for trial. Addressed below are seven motions pending before the Court. 3M moves to exclude opinions and testimony of four of Plaintiffs' expert witnesses. *See* DE 95 (Motion to Exclude Harris); DE 96 (Motion to Exclude Price); DE 97 (Motion to Exclude Spadaro); DE 98 (Motion to Exclude Crum). Plaintiffs move to exclude opinions and testimony of two of 3M's expert witnesses. *See* DE 99 (Motion to Exclude Weiss); DE 100 (Memorandum in Support of Weiss Motion); DE 101 (Motion to Exclude

Dotson).  And 3M moves for summary judgment.  *See* DE 94 (Motion for Summary Judgment). The Court has reviewed all briefing and pertinent exhibits under applicable law.

Ultimately, and for the reasons and on the terms articulated below, the Court rules as follows.  With respect to 3M's motions to exclude, the Court GRANTS DE 95 in part, GRANTS DE 96 in part, GRANTS DE 97 on terms, and GRANTS DE 98 on terms.  With respect to Plaintiffs' motions to exclude, the Court GRANTS DE 99 in part and DENIES DE 100.  And with respect to 3M's motion for summary judgment, the Court GRANTS DE 94 in part.

## I.   BACKGROUND

Plaintiffs allege that Blackburn was employed as an underground coal miner in Pike County, Kentucky from approximately 1988 to 2002.  *See* DE 1 ¶ 1, at 1.  During that time, Blackburn used respiratory protection equipment manufactured by 3M.[1]  *See id.* ¶ 6, at 2. Specifically, Blackburn used 3M 8710 and 3M 8210 respirators—disposable N95 half-facepiece respirators certified by the National Institute for Occupational Safety and Health ("NIOSH").  *See id.* ¶ 15, at 4; *see also* DE 96 at 3.  Decades after his employment ended, Blackburn was diagnosed with coal workers' pneumoconiosis/black lung disease ("CWP"), a progressive and irreversible lung disease often caused by exposure to coal mine dust and/or crystalline silica.  *See* DE 1 ¶ 16, at 4.  Plaintiffs assert that Blackburn's illness resulted from dust exposure and his use of 3M's respirators, alleged to be "defective, unsafe, and unreasonably dangerous."  *See id.* ¶ 32, at 11–12. In particular, Plaintiffs allege, *inter alia*, that the respirators failed to comply with the Occupational Safety Health Act (29 C.F.R. § 1910.134(e)(5)), did not meet federal regulatory requirements for

---

[1] In the complaint, Plaintiffs also named the following defendants:  Mine Safety Appliances Company, LLC; American Optical Corporation; Cabot CSC LLC; and Aearo Technologies LLC.  *See* DE 1 at 1. However, all four have since been dismissed from the action.  *See* DE 43 (Order Dismissing Mine Safety Appliances); DE 62 (Order Dismissing American Optical, Cabot, and Aearo Technologies).  3M is the only remaining defendant.

use around silica dust (30 C.F.R. § 11.140-5), and violated applicable quality control regulations (30 C.F.R. §§ 11.41, 11.43). *See id.* ¶¶ 18–23, at 5–8. Plaintiffs allege similar problems with respect to both 3M masks at issue.

As a result of Blackburn's illness, Plaintiffs have brought a product liability claim, *see id.* ¶¶ 31–33, at 11–12, a negligence claim, *see id.* ¶¶ 34–44, at 12–15, and a breach of warranty claim, *see id.* ¶¶ 45–47, at 15–16. Additionally, Plaintiffs seek punitive damages, *see id.* ¶¶ 48–53, at 16–17, and Mrs. Blackburn, as spouse, has brought an independent claim for loss of consortium, *see id.* ¶¶ 54–57, at 17. 3M denies any liability and has asserted various defenses.[2] *See generally* DE 19 (3M Answer). 3M has also filed a third-party complaint, naming five coal mine operators as third-party defendants. *See* DE 52. Of those five operators, only Sidney Coal Company, LLC ("Sidney Coal") has filed an answer. *See* DE 80 (Sidney Coal Answer). Sidney Coal has since been dismissed by agreement of the parties. *See* DE 93 (Order Dismissing Sidney Coal).

At the conclusion of discovery, Plaintiffs and 3M filed seven motions in total. First, 3M moves to exclude certain opinion testimony from Dr. Drew Harris—specifically, his opinion that Blackburn will require a lung transplant in the next five years and various opinions about respiratory protection equipment and causation. *See* DE 95; *see also* DE 107 (Harris Response); DE 118 (Harris Reply). Second, 3M moves to exclude certain opinion testimony from Dr. John Michael Price on reasonable alternative designs, standards of care, internal product testing, and causation. *See* DE 96; *see also* DE 108 (Price Response); DE 115 (Price Reply). Third, 3M moves to exclude certain opinion testimony from Dennis Jack Spadaro pertaining to the design and suitability of respirators. *See* DE 97; *see also* DE 106 (Spadaro Response); DE 116 (Spadaro

---

[2] 3M agrees that it is incorporated in Delaware with its principal place of business in Minnesota. *See* DE 19 ¶ 2, at 1. Given Plaintiffs' West Virginia citizenship, and the fact that they have alleged damages in excess of $75,000, this case is properly before the Court pursuant to its diversity jurisdiction.

Reply).  And fourth, 3M moves to exclude certain opinion testimony from Dr. James Brandon Crum regarding respiratory protection equipment, mining practices, and causation.  *See* DE 98; *see also* DE 105 (Crum Response); DE 117 (Crum Reply).

Plaintiffs have filed two motions to exclude the opinions and testimony of 3M's expert witnesses.  *See* DE 99; DE 101.  First, Plaintiffs move to exclude certain opinion testimony from John Weiss about causation, employer liability, personal observations, and out-of-seam dilution ("OSD").  *See* DE 99; DE 113 (Weiss Response).  Although 3M filed a response, Plaintiffs did not reply.  And second, Plaintiffs move to exclude certain opinion testimony from Dr. Scott Dotson. *See* DE 101; DE 112 (Dotson Response); DE 120 (Dotson Reply).  In particular, Plaintiffs seek to exclude:  any  opinions, calculations, and/or methodologies used to quantify, measure, or assess Blackburn's dose or risk for lung disease while using a 3M respirator; any opinions, calculations, and/or methodologies used to quantify, measure, or assess a hypothetical coal miner's dose or risk for lung disease while using a 3M respirator; any mathematical calculations used to quantify, measure, or assess Blackburn's risk of disease; and any opinions, tables, and/or charts related to the use or application of Dotson's risk model calculator.  *See* DE 101.

And finally, 3M has filed a motion for summary judgment.  *See* DE 94.  In its motion, 3M contends that Plaintiffs' product liability and negligence claims fail for, among other reasons, lack of admissible expert testimony—particularly in light of its motion to exclude Price's testimony— and that Plaintiffs' breach of warranty claim fails for lack of privity.  *See id.* at 1–2.  As a consequence of those shortcomings, per 3M, Plaintiffs' derivative claims for punitive damages and loss of consortium must also fail.  *See id.* at 2.  Plaintiffs have responded in opposition to the motion, asserting that they have put forward sufficient admissible expert testimony to sustain their product liability and negligence claims, and relatedly, their derivative claims.  *See generally*

4

DE 111 (Summary Judgment Response).  Plaintiffs do, however, concede that they are unable to recover on their breach of warranty claim.  *See id.* at 17.  3M filed a reply.  *See* DE 119 (Summary Judgment Reply).  All seven of the motions are now ripe for decision.[3]

## II.  MOTIONS TO EXCLUDE

### A.  Legal Standard

In *Daubert v. Merrell Dowell Pharmaceuticals, Inc*., 113 S. Ct. 2786 (1993), the Supreme Court "established a general gatekeeping . . . obligation for trial courts," requiring the exclusion of "expert testimony that is unreliable and irrelevant."[4]  *Conwood Co., L.P. v. U.S. Tobacco Co*., 290 F.3d 768, 792 (6th Cir. 2002) (quoting *Hardyman v. Norfolk & W. R.R. Co*., 243 F.3d 255, 260 (6th Cir. 2001)).  Consistent with that command, Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.  Specifically, "a district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Best v. Lowe's Home Ctrs., Inc*., 563 F.3d 171, 176 (6th Cir. 2009) (quoting *Daubert*, 113 S. Ct. at 2799).  This is a flexible inquiry premised "solely on principles and

---

[3] The Court notes its denial of the requested hearing.  The parties had full opportunity to make—and indeed, did make—every argument they wanted.  The Court declines to enlarge the already prolix record through the addition of a hearing.  *See Himes v. United States*, 645 F.3d 771, 784 (6th Cir. 2011) ("While the Plaintiffs were certainly entitled to request a hearing, the district court was within its discretion to deny such motions . . . .").

[4] In a diversity case, "federal law governs procedural issues, including evidentiary rulings made pursuant to the Federal Rules of Evidence."  *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 425–26 (6th Cir. 2009) (citing *Legg v. Chopra*, 286 F.3d 286, 289 (6th Cir. 2002)).

methodology, not on . . . conclusions." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (quoting *Daubert*, 113 S. Ct. at 2797).

Notably, several "[r]ed flags" may, where applicable, caution against accepting an expert. *See id.* (citing *Best*, 563 F.3d at 177). These include "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Id.* (citing *Best*, 563 F.3d at 177); *see also Baker v. Blackhawk Mining, LLC*, 141 F.4th 760, 766 (6th Cir. 2025); *In re Onglyza (Saxagliptin) and Kombiglyze (Saxagliptin and Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 345–48 (6th Cir. 2024). The proponent of the expert opinion must establish admissibility by a preponderance of the evidence. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). The newest amendment to Rule 702 codifies that standard.[5]

The Sixth Circuit has previously recognized that "*Daubert* sets out a 'flexible' and . . . lenient test that favors the admission of any scientifically valid expert testimony." *United States v. Bonds*, 12 F.3d 540, 565 (6th Cir. 1993); *see also Daubert*, 113 S. Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). And in general, motions in limine function "to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999).

In light of these principles, "a court should exclude evidence on a motion in limine only when that evidence is determined to be clearly inadmissible on all potential grounds." *Tucker v. Nelson*, 390 F. Supp. 3d 858, 861 (S.D. Ohio 2019) (citing *Delay v. Rosenthal Collins Grp., LLC*, No. 2:07-CV-568, 2012 WL 5878873, at *2 (S.D. Ohio Nov. 21, 2012)). Where evidence is not

---

[5] With regard to that amendment, the Court sees little impact, beyond clarification, for a court properly applying the rule as previously phrased. This Court has long applied the preponderance standard on admissibility of opinion evidence derived from Rule 104(a), and it has never viewed reliability findings as a matter of conditional relevance under Rule 104(b). The amendments thus are confirmatory.

6

"clearly inadmissible, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy[,] and potential prejudice can be resolved in the proper context." *Id.* (quoting *Delay*, 2012 WL 5878873, at *2). Relatedly, the Court aims to avoid excluding "broad categories of evidence." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). In such instances, the "better practice is to deal with questions of admissibility of evidence as they arise." *Id*.

### B. 3M's Motions

Across four motions, 3M seeks to exclude portions of the opinions and testimony of Harris, *see* DE 95, Price, *see* DE 96, Spadaro, *see* DE 97, and Crum, *see* DE 98. For the reasons stated below, the Court GRANTS DE 95 in part, GRANTS DE 96 in part, GRANTS DE 97 on terms, and GRANTS DE 98 on terms.

### 1. Drew Harris, M.D.

Dr. Harris is a board certified pulmonary and critical care physician who also works as a professor and administrator at the University of Virginia. *See* DE 107-1 at 1 (Harris Report). He is the medical director at one of the largest black lung clinics in the country, with his primary expertise being in the diagnosis and management of patients with lung diseases related to coal mine dust. *See id.* After reviewing Blackburn's extensive medical records and speaking with him on the phone, Harris concluded that there is clear evidence Blackburn suffers from lung disease related to coal mine dust exposure. *See id.* at 13–14. In a supplemental report, Harris also determined that it is "more likely than not that Mr. Blackburn's lung disease will progress to the point of needing a lung transplant within the next [five] years (conditional on Mr. Blackburn quitting tobacco and stopping narcotics)." *See* DE 107-2 at 2 (Harris Supplemental Report).

In its motion, 3M seeks to exclude Harris's opinion that Blackburn will require a lung transplant in the next five years along with any opinions about respiratory protection products and causation. *See* DE 95 at 1. In response, Plaintiffs note that they "are not presenting Dr. Harris to testify about respiratory protection, and therefore, the[y] . . . agree that Dr. Harris will not offer any testimony on issues involving respiratory protection." *See* DE 107 at 5–6. Given the parties' agreement and the Court's independent review, the motion is granted to the extent that 3M seeks to exclude Harris's opinions on respiratory protection products and causation relative to such products. With that being said, Harris's conclusion regarding Blackburn's probable need for a lung transplant poses a more difficult question.

3M highlights that Harris is not Blackburn's treating physician, that he has never personally examined Blackburn, and that his prognosis differs from the one given to Blackburn during a separate medical assessment at the Cleveland Clinic—where Blackburn was informed that he was "too well" for a lung transplant. *See* DE 95 at 6–7. While 3M's criticisms are mostly accurate, they do not warrant exclusion. Although Harris's supplemental opinion is concise, it is still based on sufficient facts or data, still the product of reliable principles and methods, and still reflects a reliable application of those principles and methods. Under Rule 702, that is satisfactory.

In his opinion, Harris acknowledges that speculating as to whether a patient will require a lung transplant "is not [a] straightforward" task. *See* DE 107-2 at 1. He does, however, note that the "presence of a progressive phenotype" of pulmonary fibrosis provides strong evidence that a lung transplant will be required at some point in the near future.[6] *See id.* In reaching that conclusion, Harris cites published academic literature indicating that a patient with a progressive phenotype of a fibrotic interstitial lung disease (a category that includes pulmonary fibrosis) has a

---

[6] For clarity, Harris diagnosed Blackburn with complicated CWP that meets the classification for a variety of pulmonary fibrosis known as progressive massive fibrosis. *See* DE 107-1 at 13–14.

8

relatively similar transplant-free survival time to a patient with idiopathic pulmonary fibrosis, the latter of which generally requires a lung transplant within five years. *See* DE 107-5 (Takei Study) at 5. Mortality figures Harris rationally compares offer validation on the time frame given. *See* DE 107-3 (Harris Deposition—*Blackburn v. 3M Co.*) at 25; DE 107-2 at 1.

He then goes on to accurately define the criteria for identifying a progressive phenotype of pulmonary fibrosis, noting that a patient must demonstrate at least two of "worsening lung function," "worsening radiographic disease," and "worsening symptoms." *See* DE 107-2 at 1; *see also* DE 107-4 (Raghu Study) at 16 (defining progressive pulmonary fibrosis as requiring two of "physiological evidence of disease progression," "radiological evidence of disease progression," and "worsening respiratory symptoms"). Evidently—and this is based directly on Harris's interview—Blackburn's symptoms have worsened and are limiting his ability to complete daily life activities. *See* DE 107-2 at 1. Moreover, an examination of Blackburn's radiographic progression reveals a rapidly expanding right upper lobe mass consistent with CWP. *See id.* These results, per the academic literature, suggest a reasonable probability that a lung transplant will be necessary, thus supporting Harris's ultimate conclusion. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (treating as favorable the application of principles and methods that are broadly accepted in a relevant field). A pulmonologist with Harris's credentials can make this call, before a jury.

And though 3M implies that Harris's conclusion contradicts that reached by the physicians at the Cleveland Clinic, it does not—at least, not to the extent suggested. Those doctors merely determined that Blackburn's lungs were too healthy for a transplant at the present moment. *See* DE 107 at 4–5. Harris himself agrees with that finding. *See* DE 107-3 at 24 ("And so I don't think he should get a lung transplant right now."). He only contends that Blackburn is more likely than

9

not to require a transplant within the next five years based in large part on the aforementioned radiological imaging. And in part, Harris notes that the Cleveland Clinic may not have fully accounted for the degree and pace of progression. *See id.* at 25. Although Harris's conclusion is far from certain, it need not be—the lack of a definitive prognosis does not transform his opinion into the baseless speculation 3M contends. *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) ("[S]cientific knowledge establishes the standard of evidentiary reliability, and to be considered appropriately scientific, the expert need not testify to what is known to a certainty but must only state an inference or assertion . . . derived by the scientific method." (internal citation and quotation marks omitted) (quoting *Daubert*, 113 S. Ct. at 2798)). To the extent that Harris's conclusion *is* uncertain, 3M has the right to test it through the established mechanics of trial. *See Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004) ("Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context."). Accordingly, the Court denies exclusion with respect to Harris's opinion about Blackburn's future need for a lung transplant.

### 2. John Michael Price, Ph.D.

Dr. Price is a certified industrial hygienist and safety professional that lectures at Northeastern University and the Harvard T.H. Chan School of Public Health. *See* DE 108-1 (Price Curriculum Vitae). He is also a member of the ASTM International Committee E34 on Occupational Health and Safety and holds an array of advanced degrees in chemical engineering, environmental science, and law and public policy. *See id.* In a written opinion, Price contends, *inter alia*, that the 3M 8710 and 3M 8210 respirators have various design defects, that there is a reasonably safer alternative design for those respirators, and that Blackburn's use of the respirators

was a substantial contributing factor in his development of CWP.  *See generally* DE 96-1 (Price Report).

In an extensive motion, 3M raises four arguments for exclusion, asserting that Price has no reliable basis:  (1) to opine that the "[u]se of a dual cartridge elastomeric respirator with high efficiency filters" is a reasonably safer design for the 3M 8710 and 3M 8210 respirators; (2) to define the standards of care that respirator manufacturers should follow in testing or making facepiece particulate respirators; (3) to speculate as to the reliability of 3M's internal product testing; or (4) to suggest that the defects in the respirators were a substantial contributing factor in causing Blackburn to contract lung disease.  *See* DE 96 at 1–2.  Plaintiffs oppose all four of 3M's bases for exclusion.  *See generally* DE 108.  After addressing all of 3M's points, the Court ultimately grants its motion for exclusion, in part.

i.      *Reasonably Safer Alternative Design*

Briefly, Price argues that a "dual cartridge elastomeric respirator with high efficiency filters" functions as a reasonably safer alternative design for the allegedly defective 3M 8710 and 3M 8210 respirators.[7]  *See* DE 96-1 at 45–46.  3M takes issue with that assertion, emphasizing that Price never "designed, tested, or researched whether this proposed alternative would preserve the advantages" of the 3M respirators at issue, which are "lightweight, comfortable, easy to fit, and inexpensive."  *See* DE 96 at 8; *see also* DE 96-3 (Price Deposition—*Williams v. 3M Co.*) at 4–6. 3M further claims that Price has failed to identify a reasonably safer alternative design at all.  *See* DE 96 at 7–11.  Rather, he has instead described an entirely different product.[8]  *See id.*

---

[7] An elastomeric respirator is a reusable respirator that incorporates a rubber-like band that wraps around the wearer's head to provide a tighter fit.  *See Elastomeric Respirators*, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH (Feb. 3, 2025), https://perma.cc/WL6N-S2AU.  This more durable design also "accommodates valves," which increase filtering capabilities.  *See* DE 108 at 13–14.

[8] 3M's isolated quote from a Price deposition is not, in the Court's assessment, dispositive.

As a preliminary matter, the Court notes that some of 3M's arguments are misplaced. To be sure, whether a dual cartridge elastomeric respirator is a reasonably safer alternative design for the respirators at issue, as a matter of law, is certainly relevant to 3M's motion for summary judgment. *See* DE 96 at 10–11. But the topic has limited bearing on whether Price's opinion meets the standards set out in Rule 702 and *Daubert*.[9] For the purpose of deciding this motion, the Court's only task is to determine whether those threshold requirements are satisfied. 3M's remaining arguments are addressed separately. *See infra* Part III.B.1.

Now, returning to the present motion. 3M is correct in claiming that Price has never "designed, tested, or researched" his proposed alternative respirator. *See* DE 96 at 8. But none of those steps are absolute prerequisites for admissibility. *See Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 431 (6th Cir. 2007) ("[H]ands-on testing is not an absolute prerequisite to the admission of expert testimony . . . ." (quoting *Dhillon v. Crown Controls Corp.*, 269 F.3d 870 (7th Cir. 2001))). And while conclusions based on personal experience are not enough to prove a theory that lends itself to testing and substantiation, *see id.* (citing *Dhillon*, 269 F.3d at 870), Price actively and rationally relies on 3M's internal testing or records and the Mine Safety and Health Administration's ("MSHA") regulations, among others, in reaching his ultimate finding.

With respect to 3M's internal product testing data, Price highlights the company's conclusion that maintenance free respirators, like the 3M 8710 and the 3M 8210, "cannot be fit checked with the same rigor and precision as elastomeric respirators." *See* DE 96-1 at 14. Indeed, 3M's testing reveals that a standard fit check—which assesses the degree of leakage between a user's face and a respirator's seal—conducted on maintenance free respirators results in a

---

[9] This is not to say that it has no bearing. If a dual cartridge elastomeric respirator is not, in fact, a reasonably safer alternative design, then Price's opinion would certainly be of comparative lesser use to the trier of fact. *See* FED. R. EVID. 702(a). However, the postulate that such a device does exist and is safer would certainly help the trier of fact with respect to at least the negligence claim.

comparatively high false positive error rate, thus creating the potential for an overstated fit factor.[10] *See id.* Price also references internal engineering documents that discuss the relationship between a respirator's pressure drop, or the resistance to airflow created by the respirator's filter during inhalation, and face seal leakage. *See id.* at 44–45. Specifically, Price cites materials indicating that increased pressure drop results in greater face seal leakage when the respirator does not maintain a stable seal. *See id.* He then goes on to explain that this relationship is particularly significant because breathing resistance naturally increases as a respirator is used, partially on account of escalating humidity and condensation. *See id.* at 45. In turn, this increased resistance can cause the fit and overall protection of a facepiece respirator to degrade more aggressively over time. *See id.* at 45. By contrast, Price opines that an elastomeric respirator better secures its filter to the wearer's face and maintains a tighter, more durable seal. *See id.* at 45–46.

And with regard to MSHA's regulations, Price relies on the agency's 2024 crystalline silica rule, which explains that "95 and 99 series particulate respirators do not offer [coal miners] as high a degree of protection as the 100 series . . . and are less likely to provide the expected level of protection due to . . . poor fit and vulnerability to mishandling such as folding or crushing." *See id.* at 9. According to Price, these limitations would apply to the 3M 8710 and the 3M 8210, each of which is an N95 filtering facepiece respirator ("FFR"). *See id.* at 45–46. By contrast, reusable elastomeric respirators can be fitted with 100 series filters that provide a higher level of protection. *See id.* He also takes care to note MSHA's finding that "the structural integrity" of FFRs "is very easily compromised in harsh mining environments" given the characteristic "paper-like shell" of

---

[10] Plaintiffs also cite various 3M field letters and an internal memo, all of which—like Price—ultimately conclude that the 3M 8710 (the precursor to the 3M 8210) tends to lose structural integrity in harsh mining environments. *See* DE 108 at 15. However, it is unclear whether Price himself referenced those documents in his report, or whether they had any place in reaching his conclusion. They do, in some sense, contribute to reliability.

that class of respirators. *See id.* at 9, 45–46. In Price's view, this concern is mitigated with elastomeric respirators, which make use of a more durable facepiece that straps to the wearer's face. *See id.* at 45–46.

Of course, the Court is cognizant that operation of MSHA's 2024 crystalline silica rule is presently stayed. *See* DE 115-3 (Stay Order). But that fact does not render the rule or MSHA's commentary irrelevant. Importantly, Price is not merely relying on a proposed regulation. Rather, he is relying on a formally promulgated administrative rule adopted through notice-and-comment rulemaking, ultimately reflecting MSHA's determination that stricter respiratory protection requirements are warranted under certain exposure conditions. *See* DE 109-2 (MSHA Regulation) at 47–49. That conclusion is consistent with evidence that 3M itself has evidently generated regarding the limitations of FFRs in high exposure mines. *See* DE 96-1 at 8–10. Moreover, the stay request was principally driven by implementation and compliance concerns associated with the rule's lower permissible exposure limits, not by any contention that MSHA's factual findings or scientific conclusions were unsound. *See* DE 115-2 (Motion for Stay) at 2–3. As a result, the Court credits Price's reliance on the rule in drafting his report.

Price did not conduct his own testing. But he did apply a discernible and accepted methodology to reach his conclusion, synthesizing existing test results (often 3M's own tests) and governing regulations to conclude that the 3M 8710 and 3M 8210 respirators are inferior to elastomeric respirators fitted with high efficiency filters along dimensions of efficiency, fit, and durability. *Cf. Hardyman*, 243 F.3d at 260 (citing *Dukes v. Ill. Cent. R.R. Co.*, 934 F. Supp. 939, 948 (N.D. Ill. 1996)) (treating "review [of] . . . existing research for purposes of reaching . . . conclusions" as a positive factor in evaluating the admissibility of expert testimony). To the extent that 3M feels otherwise, the Court again emphasizes that it is free to make any shortcomings in

Price's report apparent before the jury at trial. *See Ind. Ins. Co.*, 326 F. Supp. 2d at 846. At this stage, however, Price's application of reliable principles and methods to the facts of this case is sufficient.

*ii.        Standard of Care*

Several times, Price opines that 3M violated an applicable standard of care. 3M challenges those opinions, stating that "Dr. Price cannot point to any manufacturer who met his proposed standard of care requiring filter testing, fit testing, and high humidity testing on disposable respirators because he has never reviewed quality control documents from any other manufacturers." *See* DE 96 at 13. In response, Plaintiffs assert that Price need not define a specific standard of care, as he has sufficiently established, e.g., that 3M violated 30 C.F.R. § 11.140-5, and violation of a federal regulation constitutes negligence per se. *See* DE 108 at 16–17; *see also Carman v. Dunaway Timer Co., Inc.*, 949 S.W.2d 569, 570 (Ky. 1997).

As an initial matter, the Court rejects Plaintiffs' claim that a violation of § 11.140-5 would constitute negligence per se. Kentucky law is clear that "the violation of a federal statute cannot serve as the basis of a claim of negligence per se." *Bunche v. United States*, No. 17-6190, 2018 WL 4959029, at *6 (6th Cir. June 20, 2018) (Larsen, J., concurring in part) (citing *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534 (Ky. 2011)). However, that fact does not imply that 3M's alleged violation of § 11.140-5, or any federal regulation,  is irrelevant to the applicable standard of care. In fact, the regulation nevertheless provides an objective benchmark against which Price may reasonably assess 3M's conduct. Rule 702 does not require an expert to ignore an industry-specific federal regulation just because it lacks the litigation effect of a comparable state regulation. The Court proceeds accordingly.

15

Plaintiffs' argument is particularly convincing in two respects. First, Price should not—and indeed, cannot—be required to canvass every manufacturer's confidential records to identify the applicable standard of care. Rather, Price should be permitted to rely on a range of resources, including the American National Standards Institute's recommendations, *see* DE 96-1 at 12, the American Industrial Hygiene Association's manuals, *see id.* at 27, the National Society of Professional Engineers' ethical rules, *see id.* at 30–35, internal 3M documents showing concerns about respirator effectiveness, *see id.* at 14, 28–29, and his knowledge and belief that prudent manufacturers often exceed or should exceed minimum regulatory requirements, *see id.* at 43–44.

Second, Price's standard of care opinions may certainly be admitted to the extent they are premised on 3M's violation of § 11.140-5. *See id.* at 31–35. Price expressly claims that the 3M 8710 failed to satisfy § 11.140-5 while that regulation was in effect. Specifically, he asserts that 3M "was obligated to remove the mask from the market when it determined the mask was incapable of passing the NIOSH breathing machine test," which limits the degree of allowable breathing resistance, under that regulation. *See id.* at 35. Here, Price identifies a specific regulation that governed the certification of the respirator at issue; he then claims, based on 3M's internal testing data, that the respirator failed to meet the regulation's prescribed pressure drop limit while it was being sold. *See id.* at 31–35. If accepted, that conclusion will provide the jury with an objective and accepted benchmark for evaluating 3M's conduct and the product's attributes. *See Gales ex rel. Ranson v. Allenbrooke Nursing & Rehab. Ctr., LLC*, 91 F.4th 433, 435 (6th Cir. 2024) (citing FED. R. CIV. P. 702(a)). Because of that fact, and because Rule 702's requirements are otherwise satisfied, exclusion is unwarranted.

The 3M 8210 respirator, however, was not approved under § 11.140-5, nor did it need to be. Price acknowledges as such in his report, noting that "42 C.F.R. part 84 dropped" the breathing

16

test requirement, "leaving this class of mask untested for that feature after 1998." *See* DE 96-1 at 24. That said, Price draws founded parallels between the 3M 8710 and the 3M 8210, arguing that the former's vulnerabilities—as revealed in the testing—were likely transferred to the latter. Thus, per Price, some of the same flaws that beset the 3M 8710 respirator continue to attach to the 3M 8210 respirator, and 3M should have tested and accounted for the continuing role of humidity on performance. *See* DE 96-1 at 22–24. The Court finds that sentiment well-grounded under the applicable liminal framework. Price does not simply offer *ipse dixit* about 3M's testing. Rather, he relies on documented evidence of the 3M 8710 respirator's poor testing performance, along with 3M's alleged knowledge of that performance, to draw a reasonable inference about the 3M 8210 respirator. *See id.* That is, evidence that the 3M 8210 respirator was sold and marketed in the absence of prudent testing and without accounting for the effects of humidity on the respirator buttresses Price's standard of care opinions.

Ultimately, the jury will be assessing duty of care under reasonableness standards. Price's points regarding alleged known flaws in the 3M 8710 and likely persisting issues in the 3M 8210 will help the jury assess 3M's own conduct (or the conduct of an ordinarily prudent company, as applicable) under the theories presented.

### iii. *Pressure Drop and Internal Product Testing Data*

In portions of his report, Price asserts that the increased humidity and pressure drop associated with extended use of an N95 FFR results in additional breathing resistance and structural damage that worsens face seal leakage. *See* DE 96-1 at 28–29, 33, 38–40; *see also* DE 96-8 (Price Deposition—*Covington v. Clark Sand Co., Inc.*) at 5–6. He further claims that 3M's internal product testing data reveals significantly worse respirator performance data than the published literature, with wearers achieving satisfactory fit factors (defined as a fit factor of 100)

less than half of the time.  *See* DE 96-1 at 8–9; *see also* DE 96-5 (Price Deposition—*Blackburn v. 3M Co.*) at 38–43.

3M contends that Price should not be permitted to opine on either subject, as he only parrots research generated by Dr. Jim Johnson, an industrial hygienist previously retained by Plaintiffs as an expert witness, and Dr. Chris Coffey, a former NIOSH employee but onetime retained Plaintiffs' expert that published studies on the effectiveness of the 3M 8210 respirator and has since come to question his results in light of 3M's internal product testing data.  *See* DE 96 at 15–16.

More specifically, 3M argues that Price does little more than borrow from Johnson and Coffey's opinions, and as a result, acts as a mere "conduit for hearsay."  *See id.* at 16.  Of course, 3M is correct that "parrot[ing] another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion," is akin to hearsay.  *See United States v. Rios*, 830 F.3d 403, 418 (6th Cir. 2016) (quoting *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012)).  But that principle is cabined by the more general rule that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of," and that such facts or data "need not be admissible for the opinion to be admitted."  *See* FED. R. EVID. 703; *see also Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 852 (6th Cir. 1981) ("The rationale for this exception . . . is that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements upon which he bases his expert opinion.  Moreover, the opinion of expert witnesses must invariably rest . . . upon sources that can never be proven . . . ." (quoting *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971))).

18

At this juncture, the pertinent inquiry is only whether Price "has consulted numerous sources, and use[d] that information, together with his own professional knowledge and experience, to arrive at his opinion." *Mannino*, 650 F.2d at 852 (quoting *Williams*, 447 F.2d at 1290). Price has done so, and as a result, the Court concludes that his opinions are not a conduit for inadmissible hearsay under the lenient Rule 703 standard. *See Bonds*, 12 F.3d at 565.

To support his humidity opinion, Price cites outside literature that discusses respirator performance in coal mines, technical materials that address filter efficiency and pressure drop, his own analyses and experiences as an industrial hygienist, and corroborative testing. *See* DE 96-1 at 5–7, 9–11, 24–29, 44–45. And while those sources do not always discuss humidity explicitly, they do provide the technical foundation and support for Price's conclusion that moisture accumulation during extended use may increase breathing resistance and, in turn, worsen face seal leakage. *Cf. Hardyman*, 243 F.3d at 260 (citing *Dukes*, 934 F. Supp. at 948).

The same is true of Price's opinions concerning 3M's internal product testing data. In his report, Price reviews 3M's fit test data and engineering materials, including the company's historical memoranda concerning the performance of the 3M 8710 respirator in coal mines. *See* DE 96-1 at 8–10, 44–45 (noting like problems with respect to 8210). He then compares those internal results to the published literature, applying his own professional judgment to conclude, e.g., that 3M's internal findings suggest a worse fit factor than outside studies do. *See id.* He is not, despite what 3M contends, merely parroting Johnson or Coffey. *See Best*, 563 F.3d at 181 (noting that an expert's evaluation of existing data using specialized knowledge can satisfy Rule 702). To the extent 3M seeks exclusion on this basis, its motion is denied. With that being said, the Court sets an obvious and warranted caveat—Price may not, on direct, quote from or

19

reference either Coffey or Johnson's work product in his testimony.  The Court will depend on Price's  individualized analysis.

*iv.    Exposure and Causation*

At the conclusion of his report, Price states that the purported defects in the 3M 8710 and 3M 8210 respirators were significant causes of  Blackburn's illness.  *See* DE 96-1 at 49–53.  Price does not, however, attempt to calculate Blackburn's lifetime exposure to coal and silica dust. Rather, he cites published epidemiological studies, *see id.* at 50, NIOSH standards, *see id.* at 49–51, and MSHA data, *see id.* at 52–53, to ultimately conclude that coal miners like Blackburn are routinely exposed to respirable coal and silica dust at levels that can cause CWP.   From there, Price inferred that Blackburn's use of the 3M 8710 and 3M 8210 respirators, on account of their alleged inability to provide sufficient protection from coal and silica dust, was a substantial contributing factor in causing his condition.  *See id.* at 53.

3M argues that Price cannot draw that conclusion because he relies on only limited evidence (really, just Blackburn's deposition testimony) that Blackburn used 3M respirators, and relatedly, lacks any particularized knowledge about the quality of fit that Blackburn was able to achieve while allegedly using those respirators.  *See* DE 96 at 18–19; DE 115 at 13–14.  In the Court's view, Price's opinions are sufficiently grounded.  Indeed, he cites objective proof of a data fund of comparable, likely exposure in underground coal mines.  *See* DE 96-1 at 48–52.  Based on his opinions regarding the low efficacy of the 3M respirators, he then infers a link between exposure and disease development.  *See id.* at 52–53.  Blackburn's own proof, though disputed, is his claimed use of 3M masks for the full duration of his underground mining career.  *See* DE 94-1 (Blackburn Deposition Excerpt I) at 8 (noting that 90% of respirators he wore were manufactured by 3M).  Although cause is a highly contested issue for the jury, the Court sees no reason to

20

preclude Price's analysis under Rule 702. *See Daubert*, 113 S. Ct. at 2798. Certainly, 3M will have its points and queries about Blackburn's individualized mask fit. But Price may still testify regarding what the data show about the fit adequacy and consistency of 3M's respirators and the difficulties associated with assuring and testing for fit. Perhaps Blackburn *did* achieve and maintain a proper fit throughout each shift. But perhaps he did not. Either way, Price has identified a sufficient basis for questioning that premise given his data-based opinions—not only on fit itself, but also on the duration of effective protection in light of the 3M respirators' alleged structural difficulties in the arduous mining environs.

Simply put, experts are not required to "produce a mathematically precise [opinion] equating levels of exposure with levels harm." *Thompson v. Orkin, LLC*, No. 1:20-CV-13085, 2025 WL 18639, at *14 (E.D. Mich. Jan. 2, 2025) (internal quotation marks omitted) (quoting *Bednar v. Bassett Furniture Mfg. Co.*, 147 F.3d 737, 740 (8th Cir. 1998)); *see also Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir. 1999). Rather, experts may extrapolate from existing research and data to conclude that workers in particular environments face a specific type and degree of hazard. *Cf. Hardyman*, 243 F.3d at 260 (citing *Dukes*, 934 F. Supp. at 948). Price's reliance on published literature, NIOSH documents, and MSHA sampling data is methodologically sound. *See* DE 96-1 at 49–53. Those sources provide a sufficient basis for Price to conclude, in general terms, that coal miners working under conditions comparable to those described in the cited studies are exposed to respirable coal and silica dust at levels capable of causing disease, and that respiratory protection that fails to maintain an effective seal or loses that effectiveness due to dust/moisture loading increases that risk, yielding harm.

21

### 3.    Dennis Jack Spadaro

Spadaro, the former director of the National Mine Health and Safety Academy at MSHA, has worked extensively in mine safety inspection and regulation at both the state and federal levels. *See* DE 97 at 2; *Barnette v. Grizzly Processing, Inc.*, No. 7:10-CV-77, 2012 WL 293305, at \*1 (E.D. Ky. Jan. 31, 2012). He does not, however, claim to have any specialized knowledge regarding respirator design or safety.

3M seeks to exclude Spadaro's opinions concerning the design and suitability of respirators, emphasizing that such opinions are not within the boundaries of Plaintiffs' expert disclosures and are beyond the scope of Spadaro's knowledge. *See* DE 97 at 7–13. In response, Plaintiffs clarify that they "are not presenting Mr. Spadaro to offer any testimony as to the design or suitability of 3M's respirators." *See* DE 106. Rather, "Mr. Spadaro will testify about respirator use in coal mines in general based on his training, experience, and expertise" and "which respirators were used by Mr. Blackburn while working in the mines." *See id.* The Court agrees with the parties on the proper limits of Spadaro's testimony. As such, the Court grants specific exclusion on the motion's terms.[11]   *See* DE 97.

### 4.    James Brandon Crum, D.O.

Dr. Crum is a radiologist who works at Lincoln Memorial University, the Kentucky College of Osteopathic Medicine, and the United Medical Group. *See* DE 98-1 (Crum Curriculum Vitae). He is NIOSH certified for his demonstrated proficiency in classifying radiographs. *See*

---

[11] In its reply, 3M seeks assurance from the Court that Spadaro will not be permitted to testify as to whether "Mr. Blackburn's former employers might have purchased different respirators if they had known about alleged limitations for the use of 3M respirators in coal mines." *See* DE 116. The Court agrees that Spadaro may not offer that specific testimony, given his admitted lack of expertise and the speculative nature of such proof. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 669–72 (6th Cir. 2010) (emphasizing that exclusion is necessary where an opinion amounts to no more than speculation). However, Spadaro will likely be permitted to testify regarding the role of coal mine operators generally in selecting and employing (or making available) respirators, assuming that Plaintiffs lay a proper foundation.

22

DE 98-2 (Plaintiffs' Expert Witness Designation) at 3–5. Plaintiffs intend for Crum to testify regarding the nature and cause of CWP. *See* DE 98-2 at 4. Specifically, Crum will testify that the disease is caused by inhalation of coal and silica dust and manifests after a period of latency. *See id.* Crum does not claim to have any specialized knowledge regarding respirator design, performance, or safety.

3M requests that Crum's opinion testimony "regarding respiratory protection, mining practices, and causation" be excluded. *See* DE 98 at 1. Plaintiffs concede that Crum will not testify about respirators or their role in causing Blackburn's disease, nor will he testify about the alleged defects in 3M's respirators or about mining practices generally. *See* DE 105 at 1. Given the parties' agreement as to Crum's qualifications and the Court's independent review, the motion is granted to the extent that 3M seeks to exclude testimony regarding respirators, respirator defects, or mining practices. Plaintiffs also admit that Crum lacks expertise in respirator effectiveness, *see* DE 105 at 1, and indeed, the record contains no reliable evidence regarding Blackburn's specific level of exposure while using 3M respirators. Accordingly, any opinion by Crum attributing Blackburn's illness to exposure that occurred because of wearing 3M respirators—or otherwise tying his disease to the performance of those respirators—lacks a reliable basis and is thus excluded. *See Tamraz*, 620 F.3d at 669–72.

The Court will, however, allow Crum to testify about Blackburn's personal diagnosis. *See* DE 98-3 (Crum Report) at 2–4. Such opinions fall well within Crum's expertise, *see* DE 98-1, and reflect a sound application of standard clinical/radiological techniques based on imaging and exposure history, *see Beech Fork Processing, Inc. v. Spencer*, No. 21-3331, 2022 WL 247744, at *3 (6th Cir. Jan. 27, 2022) (accepting expert opinion that plaintiff developed progressive CWP

based on evaluation of plaintiff's radiological imaging and exposure history).  With respect to those opinions, Plaintiffs have cleared the requirements of Rule 702.

Lastly, the Court turns to causation.  To be sure, Plaintiffs' expert designation expressly contemplates opinions and testimony regarding the progression and cause of Blackburn's condition.  *See* DE 98-2 at 4 ("This witness is expected to testify regarding the progression of [Blackburn]'s lung condition and his future prognosis.  It is also expected that Dr. Crum will testify about general and specific causation of [Blackburn]'s lung disease . . . as related to [his] exposure history.").  The Court will limit Crum to the opinions his report contains, which are somewhat more elided.  *See generally* DE 98-3.  *See EQT Prod. Co. v. Phillips*, 767 F. App'x 626, 633 (6th Cir. 2019) ("Of paramount importance, Rule 26(a)(2)(B)(i) requires all expert reports to contain 'a complete statement of all opinions the witness will express and the basis and reasons for them.'").  The Court agrees with 3M and concludes that "[t]he most that Dr. Crum can reliably say" as to the medical cause of Blackburn's disease "is that there was coal-mine dust present in the coal mines where Mr. Blackburn worked, and that exposures to coal-mine dust are associated with the development" of that disease.  *See* DE 117 at 2.  Similarly, he may opine that Blackburn's diagnosis is consistent with dust exposure.  Though obviously, Crum may not purport to specify his precise degree or level of exposure.

### C.  Plaintiffs' Motions

In their two motions, Plaintiffs seek to exclude portions of the opinions and testimony of Weiss, *see* DE 99, and Dotson, *see* DE 101.  For the reasons stated below, the Court GRANTS DE 99 in part and DENIES DE 101.

### 1. John Weiss

Weiss is a vice president of John T. Boyd Company, a privately owned mining and geological consulting firm. *See* DE 113-2 (Weiss Curriculum Vitae) at 2. He is a registered professional engineer and has prior experience working as an underground mine foreman. *See id.* at 4–5. 3M intends for Weiss to testify about topics including mine design, underground production operations, underground mine ventilation, miner training, dust exposure, respirator use, and more. *See* DE 113-1 (3M's Expert Witness Designation—Weiss) at 5.

In their motion, Plaintiffs ask the Court to exclude Weiss's opinions about causation, employer liability, personal observations, and OSD. *See* DE 99; DE 100 at 5–11. 3M opposes Plaintiffs' arguments, asserting that all of the challenged opinions comply with the requirements of Rule 702. *See* DE 113. Plaintiffs did not reply. Ultimately, the Court finds partial exclusion warranted.

### i.    Causation

Plaintiffs first seek to exclude Weiss's opinions concerning the medical cause of Blackburn's CWP. *See* DE 99; DE 100 at 5–7. In response, 3M expressly states that Weiss will not offer any testimony on medical causation. *See* DE 113 at 5–7. Rather, he will opine on the role that mine operators generally play in protecting workers from harmful dust exposure, *see id.* at 6–7, specifically asserting that Blackburn "was periodically exposed to concentrations of respirable coal and respirable silica dust over his career due to the collective actions and/or inactions of the mine operators, and not 3M . . . or others," *see* DE 99-4 (Weiss Report) at 15. Similarly, Weiss will opine that "federal MSHA data conclusively establishes that the operators of the mines where [Blackburn] worked violated" federal regulations. *See id.*

This testimony, as framed by 3M, is largely permissible. Of course, Weiss may not attempt to diagnose Blackburn or explain the biological mechanisms by which coal and silica dust produced his disease. And indeed, Weiss expressly disclaims any expertise on "the human mechanics or the health mechanics of contracting black lung." *See* DE 99-2 (Weiss Deposition—*Blackburn v. 3M Co.*) at 20–21. He instead states, in general terms, that CWP "is caused by significant exposure to respirable dust," that mine operators alone have "the ability to create respirable dust concentrations in . . . underground active workings," and that mine operators are obligated "to control those concentrations of dust." *See* DE 99-4 at 2, 14. These are logical principles easily derived from Weiss's experience and expertise, including his regulatory facility. *See, e.g.*, *In re du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 348 F. Supp. 3d 698, 716 (S.D. Ohio 2016) ("The expert testimony . . . relates to the industry standards based upon the state of the medical, scientific, and/or industrial knowledge. . . . These standards will be helpful to the jury in its evaluation . . . .").

And although Weiss is unqualified to infer the precise cause or mechanics of Blackburn's CWP, he can certainly state the truism that the disease is generally correlated with substantial cumulative exposure to respirable coal and silica dust in mining environments. *See* DE 99-4 at 14. That latter proposition does not require him to render a medical diagnosis, nor does it require any particularly rigorous methodology. Rather, it reflects a general mining principle concerning the source and control (and risk) of respirable dust in underground coal mines. *See In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 767 F. Supp. 3d 495, 505 (E.D. Mich. 2025) ("When an expert's testimony does not take the form of an opinion, but rather focuses on 'educat[ing] the factfinder on general principles,' application of the foundational elements in Rule 702 takes on a different cast." (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendment)). The

26

Court sees no basis to prevent Weiss from testifying that mine operators control dust exposure, or from testifying that a miner that develops CWP experienced dust exposure sufficient to produce disease.

But due to the limits of his expertise, the Court reiterates that Weiss may not testify regarding the specific medical cause of Blackburn's disease or the relative contribution of various risk factors in causing his disease. *See* DE 99-2 at 20–21. Nor may Weiss testify, as suggested in a previous deposition, that "[i]f dust levels are such that . . . a mine worker gets [CWP], it is because of the exposure to levels of dust that exceed mandatory limitations." *See* DE 113-3 (Weiss Deposition—*Hill v. 3M Co.*) at 11. Weiss does not provide any basis for this conclusion or describe any methodology, or expertise in his ken, for reaching it in his report. *See generally* DE 99-4. The Court will not allow such testimony. Weiss may, however, testify that Blackburn was likely exposed to respirable coal and silica dust at levels beyond the regulatory limits at certain points in his career. *See id.* at 14. This conclusion is entirely consistent with the MSHA data that Weiss cites and interprets in his report, and it otherwise satisfies Rule 702. *See id.* at 17–22; *see also Arnold v. United States*, Nos. 22-5003 & 22-5005, 2022 WL 17830617, at *5 (6th Cir. 2022) (noting the importance of using expert testimony to interpret data).

### ii.    *Employer Liability*

Plaintiffs next seek to exclude Weiss's opinions concerning the ultimate responsibility of the mine operators that employed Blackburn. *See* DE 99; DE 100 at 7–9. 3M states that Weiss "does not attempt to define the general standard of care of an employer to an employee." *See* DE 113 at 7–8. Instead, he merely "identifies how coal mine workers are supposed to be protected by coal mine operators complying with coal industry regulations." *See id.* at 8. The Court agrees

27

that Weiss may describe the particulars of safety responsibilities of mine operators, as he perceives them from a regulatory standpoint and based on his extensive experience in the industry.

### iii.    Personal Observations

Plaintiffs also seek to exclude Weiss's personal observations about the limited or particular use of respirators in coal mines because they are not helpful for understanding his testimony or the case. *See* DE 99; DE 100 at 9–10. 3M disagrees, asserting that Weiss's observations follow logically from his professional experience and will assist the trier of fact. *See* DE 113 at 8–9.

Rule 702 expressly contemplates testimony based on an expert's "knowledge, skill, experience, training, [and] education." In instances "where non-scientific expert testimony is involved, 'the [*Daubert*] factors may be pertinent,' or 'the relevant reliability concerns may focus upon personal knowledge or experience.'" *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007) (quoting *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001)). The critical fact is that "[t]he gatekeeping inquiry is context-specific and 'must be tied to the facts of a particular case.'" *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 119 S. Ct. 1167, 1175 (1999)).

Plaintiffs do not contest that Weiss has more than four decades of experience working in and around coal mines, rendering his personal observations about mining practices reasonably reliable. *See* DE 113-2. In the Court's judgment, Weiss's opinions on respirator use stem directly from his professional experience and represent the kind of industry-based observations and practical judgments that experts routinely provide. Weiss further supports those opinions through his reliance on a published study. *See* DE 99-4 at 14. Of course, the Court recognizes that Weiss's observations are not specific to the mines where Blackburn worked. But while Plaintiffs are certainly permitted to challenge the representativeness and significance of those observations as a

result of that fact, the proper place to do so is at trial. *See Ind. Ins. Co.*, 326 F. Supp. 2d at 846. Accordingly, the Court will not exclude Weiss's opinions concerning his personal observations of respirator usage in coal mines. His notes regarding typicality in the industry, both from the operators' and miners' perspectives, are particularly useful in a case that focuses on conduct in a period far removed from the time of trial.

### iv.    Out-of-Seam Dilution

Plaintiffs finally seek to exclude Weiss's OSD opinion because he failed to review the underlying MSHA data, relied in part on work performed by his assistant, and did not initially produce the materials that he used to calculate coal seam thickness. *See* DE 99; DE 100 at 10–11. The term "out-of-seam dilution" refers to the amount of non-coal roof and floor material that is extracted while mining a coal seam. *See* DE 99-4 at 11. Weiss specifically contends that the two Pike County coal mines Blackburn worked at from 1992 to 2002 mined excess OSD material given the thickness of the coal seams at those mines, resulting in higher than necessary quantities of airborne silica dust. *See id.* at 10. 3M contends that Weiss's opinion is sound and based on reliable principles and methods. *See* DE 113 at 9–11.

The Court agrees with 3M. Experts are not required to personally gather the data underlying their opinions. *See, e.g.*, *United States v. Roberts*, 830 F. Supp. 2d 372, 383 (M.D. Tenn. 2011) ("[E]xperts may rely on data from others, at least to the extent that the data is of the type reasonably relied on by other experts in the field."). Nor are they prohibited from relying on information compiled by assistants. *See, e.g.*, *Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*, 520 F. Supp. 3d 872, 889 (E.D. Mich. 2021) (recognizing that assistance in preparing an expert report is permissible so long as the expert actually participated to a substantial degree). For these reasons, the Court sees no reason why Weiss's reliance on MSHA disclosure data—even

if he failed to personally review that data—or Weiss's consultation with his subordinate would warrant exclusion.[12]  Plaintiffs may test the conclusions, of course, but the Court will not exclude.

And to the extent Plaintiffs seek exclusion on account of 3M's failure to disclose the materials underlying Weiss's opinion, their request is likewise denied.  The MSHA data at issue was publicly available, and 3M noted in its expert witness designation that Weiss would rely on a range of sources in drafting his report.  *See generally* DE 113-1.  Moreover, Plaintiffs had an opportunity to depose Weiss regarding the basis for his opinions, *see* DE 99-2 at 10–12, and 3M supplemented the record with a detailed declaration explaining Weiss's calculations, *see* DE 113-4 at ¶¶ 15–20, at 4–5.  Given Plaintiffs' knowledge and ability to access the MSHA data, coupled with 3M's efforts to remedy its purported non-disclosure, the Court finds no mystery and any marginal failure to disclose harmless.  *See Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003) ("The advisory committee's note . . . 'strongly suggests that "harmless" involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party.'" (quoting *Vance v. United States*, No. 98-5488, 1999 WL 455435, at *5 (6th Cir. June 25, 1999))).  The narrow point is that Weiss leans on objective data, available to all, in reaching his OSD-related views.  That, here, suffices.

### 2. Scott Dotson, Ph.D.

Dr. Dotson is an industrial hygienist "with over 20 years of experience in the fields of industrial hygiene, occupational health, toxicology, and human health risk assessment."  *See* DE 101-1 (3M Expert Witness Designation) at 18.  He is a former NIOSH employee that currently works as a scientific consultant at Insight Exposure & Risk Sciences Group.  *See id.* at 19.  3M

---

[12] Notably, Weiss also provides additional explanation for the seam thickness values that he used and the OSD figures that he calculated in a supplemental declaration.  *See* DE 113-4 (Weiss Supplemental Declaration) ¶¶ 15–20, at 4–5.

intends for Dotson to testify, among other things, about "general principles of workplace exposure management," "health risks and regulations associated with coal mining," "occupational exposure limits for respirable" coal and silica dust, the responsibility that mine operators have for "ensuring the safety and health of their employees," and the use of respirators for reducing exposure to airborne contaminants. *See id.* at 19–21.

In their motion, Plaintiffs ask the Court to exclude Dotson's dose and exposure calculations as irrelevant. *See* DE 101 at 7–12. Plaintiffs further assert that Dotson's methodology was neither subject to peer review nor adopted by others in the scientific community, *see id.* at 12–14, and that his risk model calculation is inadequately supported, *see id.* at 14–17. 3M responded in opposition, stating that Dotson's opinions satisfy the requirements of Rule 702 and that Plaintiffs' other arguments go to weight and not admissibility. *See* DE 112 at 6–10. Plaintiffs then filed a reply that largely reiterated their initial claims. *See* DE 120. With respect to the present motion, the Court fully denies exclusion.

### i.     *Relevance*

Plaintiffs first argue that Dotson's attempts to model Blackburn's dose and exposure are irrelevant because they are based on dated studies that involve geographically disparate mines, rely on assumptions concerning a "hypothetical coal miner," and do not incorporate particularized data from the mines where Blackburn worked. *See* DE 101 at 7–12. But Plaintiffs misunderstand or miscast the scope of the Court's inquiry. Dotson's opinions need only "help the trier of fact to understand the evidence or to determine a fact in issue."[13] *See* FED. R. EVID. 702. The Court has

---

[13] Of course, this is not to say that relevance alone renders an expert opinion admissible. *See* FED. R. EVID. 702. The Court's only point is that the relevance inquiry is readily satisfied in the present case. And while Plaintiffs cite Kentucky law to support their argument, *see* DE 101 at 12, the Court again notes that, in a diversity action, "federal law governs procedural issues, including evidentiary rulings made pursuant to the Federal Rules of Evidence," *Gass*, 558 F.3d at 425–26 (citing *Legg*, 286 F.3d at 289).

no doubt that Dotson's efforts to model Blackburn's dose and exposure, topics that will matter centrally in a case entirely premised on Blackburn's exposure to airborne particulates and his alleged resulting development of CWP, satisfy that standard. *See Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 905 (6th Cir. 2006) ("As the Supreme Court and this Court have noted on numerous occasions, this standard of relevancy is liberal."). Accordingly, the Court denies exclusion. Plaintiffs' prior referenced challenges to Dotson's methods may be raised during cross-examination. *See Daubert*, 113 S. Ct. at 2798.

### ii.   Peer Review and Scientific Adoption

Plaintiffs next argue that Dotson's methodology was not subject to peer review and has not been adopted by others in the scientific community. *See* DE 101 at 12–14. Certainly, these facts are relevant to the admissibility of Dotson's opinions under *Daubert*. *See Daubert*, 113 S. Ct. at 2797 ("[One] pertinent consideration is whether the theory or technique has been subjected to peer review and publication. . . . '[G]eneral acceptance' can [also] have a bearing on the inquiry."). The Court considers these facts as part of that assessment. However, there is simply no requirement that all of the *Daubert* factors be satisfied in every case. *See Hayes Outdoor Media, LLC v. S. Tr. Ins. Co.*, 574 F. Supp. 3d 565, 568 (W.D. Tenn. 2021) (citing *Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 445 (6th Cir. 2012)) ("The *Daubert* factors are not exhaustive, and not all of them apply in every case."); *see also Kumho Tire Co., Ltd.*, 119 S. Ct. at 1171 ("[T]he law grants a district court . . . broad latitude . . . in respect to its ultimate reliability determination."). As a result, the Court declines to grant exclusion based alone on an asserted lack of peer review and scientific adoption.

*iii.    Risk Model Calculation*

Plaintiffs finally argue, and this really is the thrust, that Dotson's risk model calculation fails to satisfy the requirements of Rule 702 and Rule 703.[14]  *See* DE 101 at 14–17; *see also* DE 101-4 (Dotson Report) at 113–16.  Specifically, Plaintiffs note that Dotson did not personally perform some of the statistical calculations supporting his findings and, in prior testimony, acknowledged that another person developed the risk model calculator.  *See id.*; *see also* DE 101-11 (Dotson Deposition—*Wilson v. 3M Co.*) at 3–6.  Per Plaintiffs, Dotson's lack of personal knowledge regarding the statistical computations underlying his opinions renders his report inadmissible.

As the Court has already noted, Rule 702 does not require experts to personally gather data or spurn professional assistance in drafting their opinions.  *See, e.g.*, *Roberts*, 830 F. Supp. 2d at 383; *Innovation Ventures, LLC*, 520 F. Supp. 3d at 889.  In fact, Rule 703 expressly contemplates reliance on facts and data, where appropriate, that an expert has only been made aware of by some other party.  For deciding the instant motion, the relevant inquiries are whether Dotson possesses sufficient knowledge to explain and defend his opinion, and whether 3M has established that those opinions are based on sufficient facts and data and reflect a legitimate application of a reliable methodology.  *See* FED. R. EVID. 702; *see also Hehrer v. Clinton Cnty.*, No. 1:20-CV-1079, 2024 WL 4713047, at *4 (W.D. Mich. Aug. 19, 2024) ("The Court must determine 'whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case.'" (quoting *Kumho Tire Co., Ltd.*, 119 S. Ct. at 1178)).

In his report, Dotson clearly identifies the range of source materials on which he relied.  *See* DE 101-4 at 6–8.  He also explains the assumptions underlying his analysis, stating that he

---

[14] While Plaintiffs actually reference the Kentucky Rules of Evidence, the Court evaluates their challenges under the proper set of rules.

used previously published quantitative risk assessments developed by the NIOSH and epidemiological scholars to estimate "the excess risk" of CWP and pulmonary fibrosis associated with different concentrations of respirable coal mine dust. *See id.* at 113–14. Dotson also notes how his excess risk calculation will vary based on a worker's respirator use and the protection factor assigned to those respirators. *See id.* He then details the sequence of calculations that he performed to estimate Blackburn's lifetime exposure and associated disease risk under various respirator-use scenarios. *See id.* 121–23. Collectively, those calculations undergird Dotson's ultimate conclusion that "3M respirators would have reduced exposures to [respirable crystalline silica] across the entire . . . size range" of respirable particles, and thus, "would have substantially reduced Mr. Blackburn's risk of coal mine workers' lung diseases." *See id.* at 142. He assumes, of course, that the masks were functioning as designed and intended. *See id.* at 106 (noting that respirators "reduc[e] the risk of coal mine workers' lung diseases when worn properly").

Plaintiffs do not meaningfully dispute this analysis. Rather, they point to moments in a deposition—from a separate case, at that—where Dotson acknowledged his inability to identify the precise assumptions that factored into his calculations. *See* DE 101-11 at 3–6. That acknowledgment certainly seems to be fodder for cross-examination. *See Daubert*, 113 S. Ct. at 2798. However, it does nothing to disrupt the apparent soundness of Dotson's underlying methodology as demonstrated here, or the soundness of that methodology's application to the facts and data of this case. *See Davis Elecs. Co., Inc. v. Springer Cap., LLC*, 558 F. Supp. 3d 443, 447 (W.D. Ky. 2021) ("So long as the proffered testimony is properly grounded, well-reasoned, and not speculative, district courts should admit it, for the rejection of expert testimony is the exception rather than the rule." (quoting *Crouch v. John Jewell Aircraft, Inc.*, No. 3:07-CV-638, 2016 WL 157464, at *2 (W.D. Ky. Jan. 12, 2016))). And critically, nothing suggests that Dotson failed to

34

substantially contribute to and generate his own report.  *See Innovation Ventures, LLC*, 520 F. Supp. 3d at 889.

Plaintiffs' additional criticisms—that Dotson's analytical approach was not subject to adequate peer review, that no standards group or scientific organization has adopted his methodology, that his report was created for the purpose of litigation, and that his calculations were insufficiently particularized—all, insofar valid, factor into the Court's *Daubert* analysis.  But all are contested, and none sufficient to overcome the Court's presumption in favor of admission. *See Bonds*, 12 F.3d at 565 (6th Cir. 1993); *Brawner,* 173 F.3d at 970.  Furthermore, the Court notes that several of Plaintiffs' criticisms are at least arguably ill-founded.  Dotson's methods are directly based on published and peer-reviewed academic literature.  *See, e.g.*, Eileen D. Kuempel et al., *Risks of Occupational Respiratory Disease Among U.S. Coal Miners*, 12 APPLIED OCCUPATIONAL & ENV'T HYGIENE 823, 824–26 (1997).  Moreover, his findings are premised on the established multiple path particle dosimetry ("MPPD") model that has been adopted by NIOSH.  *See* DE 101-4 at 120–23, 138 (noting use of MPPD model by NIOSH and EPA).  These facts erode the very core of Plaintiffs' arguments.  Ultimately, Plaintiffs' failure to meaningfully grapple with Dotson's methods and conclusions, when considered with the evident soundness of those methods and conclusions, counsels against exclusion.  Any further challenges go to the weight of this report— not its admissibility.  *See Ind. Ins. Co.*, 326 F. Supp. 2d at 846*.*  3M has shown, by a preponderance under the Rule 702 rubric, that the jury should hear from Dotson on the subject matters addressed.

### III.   SUMMARY JUDGMENT

#### A.  Legal Standard

Summary judgment is appropriate when the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* FED.

R. CIV. P. 56(a)–(c).  In determining whether there exists a genuine dispute of material fact, the Court must consider all facts and draw all inferences in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).  Further, the Court may not "weigh the evidence [or] determine the truth of the matter" in evaluating whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).  However, "only admissible evidence [i.e., a form admissible at trial] may be considered by the trial court in ruling on a motion for summary judgment."  *Rogers v. Lilly*, 292 F. App'x 423, 428 n.3 (6th Cir. 2008) (quoting *Smoot v. United Transp. Union*, 246 F.3d 633, 649 (6th Cir. 2001)).

The moving party bears the initial burden of showing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2552 (1986).  If the moving party satisfies its burden, the burden shifts to the non-moving party to produce "specific facts" that suggest a "genuine issue" for trial.  *See id.* at 2553.  Notably, this is "an affirmative duty to direct the Court's attention to those specific portions of the record upon which [the non-moving party] seeks to rely to create a genuine issue of material fact."  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).  If the non-moving party cannot make a showing sufficient to establish the existence of an essential element of its case, then "Rule 56(c) mandates the entry of summary judgment."  *Celotex*, 106 S. Ct. at 2552.

A fact is "material" when the substantive law that underlies the dispute identifies it as such.[15]  *See Anderson*, 106 S. Ct. at 2510.  That is, "disputes over facts that might affect the

---

[15] While not in dispute, it is worth stating for completeness why Kentucky law is the applicable substantive law in this matter.  A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits.  *See Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406, 435 (6th Cir. 2017).  Kentucky courts apply the "any significant contacts" test in tort actions.  *See Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009).  Pursuant to that test, "any significant contact with Kentucky [i]s sufficient to allow Kentucky

outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* An issue is "genuine" when "there is sufficient evidence favoring the [non-moving] party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 88 S. Ct. 1575, 1592 (1968)). Sitting in diversity, the Court must look to federal law to resolve procedural issues, and Kentucky law to resolve substantive ones. *See Hanna v. Plumer*, 85 S. Ct. 1136, 1141 (1965); *Erie R.R. Co. v. Tompkins*, 58 S. Ct. 817, 822 (1938).

Summary judgment is also proper when the non-moving party's pleading fails to state a claim upon which relief can be granted. *See Carter v. Ford Motor Co.*, 561 F.3d 562, 567 (6th Cir. 2009). Although the analysis of a pleading's sufficiency at the summary-judgment stage resembles the analysis of a Rule 12(b)(6) motion, the two inquiries are not identical. *See id.* at 567–68. Generally, by the time that a party moves for summary judgment, the liberal federal discovery rules have brought "the gravamen of the dispute . . . frankly into the open for inspection by the court." *See id.* at 568 (quoting *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 789 (6th Cir. 2005)). Accordingly, district courts need not apply the more flexible plausibility standard articulated in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964–69 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–50 (2009), when assessing the legal sufficiency of a claim at the summary judgment stage. Instead, if the undisputed facts show that the plaintiff cannot establish a viable legal claim, summary judgment is warranted. *Cf. Smith v. City of Salem*, 378 F.3d 566, 576 n.1 (6th Cir. 2004).

---

law to be applied." *Id.* (quoting *Bonnlander v. Leader Nat'l Ins.*, 949 S.W.2d 618, 620 (Ky. Ct. App. 1996)). Because Blackburn was allegedly injured in Kentucky, the "any significant contacts" test is assuredly met. *Cf. Brewster v. Colgate-Palmolive Co.*, 279 S.W.3d 142, 145 n.8 (Ky. 2009). As a result, the Court applies Kentucky law.

### B. Analysis

3M raises a host of arguments in its motion for summary judgment, some of which the
Court can quickly dispatch.  First, the Court has already decided that it will not exclude most of
Price's opinions.  *See supra* Part II.A.2.  As a result, the Court will not grant summary judgment
on Plaintiffs' product liability and negligence claims for lack of admissible expert testimony.[16]
*See* DE 94 at 8–9.  Second, the parties agree that Plaintiffs' breach of warranty claim fails for lack
of privity between Blackburn and 3M.  *See id.* at 20; DE 111 at 17.  The Court concurs and grants
summary judgment for 3M on that claim.  And third, Plaintiffs do not dispute that the survival of
their punitive damages and loss of consortium claims depends on the survival of either their
product liability claim or their negligence claim.  *See* DE 94 at 21; DE 111 at 17.  Again, the Court
concurs and will proceed accordingly.

3M makes four remaining arguments:  (1) Plaintiffs have not proposed a reasonably safer
alternative design for 3M's allegedly defective respirators, a prerequisite for their product liability

---

[16] A note on causation.  Kentucky law only requires Plaintiffs to establish that 3M's conduct was a
"substantial factor in bringing about . . . harm."  *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 77 (Ky.
2010).  Construing the evidence in the light most favorable to Plaintiffs, the record contains sufficient
admissible expert testimony regarding alleged defects in the respirators, the increased risk of respirable coal
and silica dust exposure associated with those alleged defects, Blackburn's extensive occupational exposure
history in a dust-rich environment, and his CWP diagnosis, all permitting a reasonable juror to conclude
that 3M substantially contributed to his disease-producing exposure.  To be sure, 3M accurately cites
*Adams v. Cooper*, No. 5:03-CV-476, 2021 WL 2339741, at *1 (E.D. Ky. June 19, 2012), for the proposition
that both specific and general causation must be established in a toxic tort case.  But in the toxic tort context,
those inquiries are limited to whether "a particular toxic substance is capable of causing [the party's] injury,
and [whether] that the toxic substance did, in fact, cause the injury."  *See id.* (citing *Pluck v. BP Oil Pipeline
Co.*, 640 F.3d 671, 676–77 (6th Cir. 2011)).  Blackburn has adduced sufficient evidence to establish that
exposure to coal and silica dust *can* cause disease, and indeed, as a reasonable inference, *did* cause his
disease.  Plaintiffs do not allege that the respirators themselves caused Blackburn's disease, instead alleging
that the respirators' defective designs resulted in greater and unanticipated exposure to coal and silica dust.
Thus, given the evidence supporting general and specific causation with respect to Blackburn's disease,
and the prior referenced evidence supporting 3M's substantial role in causing Blackburn's heightened
exposure to coal and silica dust, summary judgment will not be granted for lack of admissible expert
testimony.

and negligence claims,[17] *see* DE 94 at 10–14; (2) Plaintiffs lack evidence of specific causation with respect to their fit defect criticisms, *see id.* at 15–16; (3) Plaintiffs lack evidence to support their manufacturing defect theory, *see id.* at 16–17; (4) Plaintiffs lack evidence to support their inadequate warnings and instructions theory, *see id.* at 18–20.  Each is addressed in turn.

### 1.  Reasonably Safer Alternative Design Opinion

First, 3M asserts that Plaintiffs have failed to prove a reasonably safer alternative design for the 3M 8710 and 3M 8210 respirators.  *See* DE 94 at 10–14.  Although 3M acknowledges Price's suggestion that a dual cartridge elastomeric respirator with high efficiency filters could fill that role, it claims that the design is not "practical under the relevant circumstances."  *See id.* at 12.  3M specifically states that Price's design is a different product, as it is "made of rubber, not woven fibers," and relies "on reusable filters instead of a single-use filtering facepiece."  *See id.* Additionally, 3M notes that the design "would 'weigh a lot more' and 'cost a lot more' . . . and be larger and more awkward to wear."  *See id.* (quoting DE 94-8 (Price Deposition—*Feltner v. 3M Co.*) at 4–5).  In its reply, 3M also disputes whether Price's design is actually safer.  *See* DE 119 at 7–8.

Although Kentucky law is admittedly "scant on the precise elements a plaintiff must prove to recover on" a product liability claim premised on a design defect, the Kentucky Supreme Court has recognized that a plaintiff must, at the very least, "establish existence of an alternative, safer design that is practical under the relevant circumstances."  *Primal Vantage Co., Inc. v. O'Bryan*, 677 S.W.3d 228, 249 (Ky. 2022).  The question is thus whether Plaintiffs "can . . . make a 'sufficient showing' of a feasible, alternative design to defeat the motion for summary judgment."

---

[17] The Court notes that, in its view, Plaintiffs' inadequate instructions and warnings theory does not depend on the existence of a reasonably safer alternative design.  That claim would persist even if the Court agreed on the absence of a demonstrated alternative design.

*See Smith v. Ethicon, Inc.*, No. 6:20-CV-222, 2021 WL 4098408, at *4 (E.D. Ky. Sept. 2, 2021) (quoting *Celotex Corp.*, 106 S. Ct. at 2552).  Importantly, a "wholly distinct product[]" does not "constitute proof of a feasible, alternative design of the salient . . . product."  *Id.* (citing *Mullins v. Johnson & Johnson*, 236 F. Supp. 3d 940, 943 (S.D. W. Va. 2017)).  And due to the fact that "this subject matter is outside the scope of lay knowledge, [Plaintiffs] must offer 'sufficiently detailed expert testimony to establish that a reasonable alternative design could have been practically adopted at the time of the sale.'"  *Id.* (quoting *Burton v. Ethicon Inc.*, No. 5:20-CV-280, 2021 WL 1725514, at *2 (E.D. Ky. Apr. 30, 2021)).

The Court begins by addressing Plaintiffs' claim that dual cartridge elastomeric respirators with high efficiency filters are safer than disposable N95 half-facepiece respirators.  In their response, Plaintiffs highlight a number of similarities between Price's proposed design and the 3M 8710 and 3M 8210 respirators, one being their shared Occupational Health and Safety Administration ("OSHA") assigned protection factor.  *See id.* at 9.  3M seizes on that point, claiming that Price's alternative design cannot be safer than 3M's disposable respirators due to that commonality.  *See* DE 119 at 7–8.  However, 3M neglects to reference Plaintiffs' separate argument that the 3M 8710 and 3M 8210 provide inadequate protection because of their inability to maintain structural integrity in harsh mining environments and to effectively combat pressure drop, and its effects, over time.  *See* DE 96-1 at 45–46.  Per Plaintiffs, these failings—which go beyond the respirators' assigned protection factor—are part of what makes elastomeric respirators safer.[18]  *See id.*  As a result, the Court concludes that there is a triable issue of fact as to whether Price's proposed design is safer.

---

[18] This is to say nothing of Plaintiffs' broader claim that the 3M 8710 should not have received regulatory approval in the first place on account of undisclosed fit testing flaws.  *See* DE 96-1 at 31–35.  If the respirator were not approved, it obviously would not have received that same protection factor.

The Court next turns to Plaintiffs' claim that dual cartridge elastomeric respirators with high efficiency filters are a reasonable alternative for disposable N95 half-facepiece respirators. 3M's distinctions bear some note. Price's proposed alternative is made of a different material. *See* DE 94 at 12–13. Additionally, it is reusable rather than disposable, and it is almost surely heavier and more costly. *See id.*; DE 94-8 at 4–5. But the mere fact that there are *some* differences between Price's design and the 3M 8710 and 3M 8210 respirators will not suffice to quash the claims. *Cf. Olszeski v. Ethicon Women's Health & Urology*, No. 5:19-CV-1787, 2022 WL 1063737, at *2 (W.D. Ky. Apr. 8, 2022) ("[P]roducts are not substantially different simply because they are comprised of different materials . . . ." (quoting *Pizzitola v. Ethicon, Inc.*, No. 4:20-CV-2256, 2020 WL 6365545, at *5 (S.D. Tex. Aug. 31, 2020))). At the summary judgment stage, the proper inquiry is whether Plaintiffs have presented any "evidence of probative value to support that there was 'an alternative safer design, practicable under the circumstances,'" *Primal Vantage Co., Inc.*, 677 S.W.3d at 248 (quoting *Trent v. Ford Motor Co.*, 2 F. Supp. 3d 1022, 1026 (W.D. Ky. 2014)), sufficient to create a genuine dispute of material fact, *see Celotex Corp.*, 106 S. Ct. at 2552.

Plaintiffs have met that burden. While Price's proposed design is certainly distinct, elastomeric respirators and half-facepiece disposable respirators still serve the same purpose through the same essential means: they both filter airborne particulates; they both operate by forming a tight-fitting seal with the user's face; and they both rely on similar scientific principles, including negative pressure. *See* DE 111; DE 96-1 at 14–17, 44–46. Although 3M highlights Spadaro's testimony indicating that he has never seen a coal miner wear something akin to Price's respirator, *see* DE 94-11 (Spadaro Deposition Testimony—*Martin v. 3M Co.*) at 3–4, that testimony does not, in and of itself, establish that the design is impractical.

41

In fact, 3M largely overlooks the evidence of similarity that Plaintiffs *have* provided.  For instance, Plaintiffs have produced a business plan indicating that the 3M 8710 respirator was designed to compete with elastomeric respirators in the same field.  *See* DE 111-5 (3M Business Plan) at 4–5, 8–9.  Plaintiffs have also produced OSHA correspondence stating that both varieties of respirators are "negative pressure respirators," that filtering half-facepiece respirators are "in the same category as . . . elastomeric half-mask respirator[s]," and that both respirators have an identical "assigned protection factor . . . of 10."  *See* DE 111-3 (OSHA Guidance) at 1–2.  Finally, 3M itself acknowledges Blackburn's claim that he "occasionally us[ed] elastomeric respirators with replaceable filters" during his time as a coal miner.  *See* DE 94 at 2.  All of these facts suggest that elastomeric respirators are not as distinct or as impractical as 3M contends.  Even Weiss, 3M's own witness, claims that coal companies predominately provide elastomeric respirators to miners and that FFR masks "represent a small fraction of industry-wide utilization."  DE 99-4 at 14.

And while 3M heavily relies on *Primal Vantage Co., Inc.*, *see* DE 94 at 11–13, that case is also not as on-point as 3M suggests.  There, the plaintiff's proposed alternative for an allegedly defective hunting ladder relied on fundamentally different principles—a freestanding design over a design that made use of polypropylene straps.  *See Primal Vantage Co., Inc.*, 677 S.W.3d at 249.  The case was mostly about failed straps and a materials alternative aimed not at the failed straps, but rather, at the downstream impact of strap failure on the structure.[19]  *See id.* (noting focus on use, fitness, and viability of polypropylene straps).  In contrast, the elastomeric respirator that Price proposes makes use of analogous operating principles relative to product mechanics and particulate filtration.  *See* DE 96-1 at 14–17, 44–46.

---

[19] And as to strap alternatives, the Kentucky Supreme Court rejected one alternative as not existing at the time.  The second alternative was bygone and carried separate risks that disqualified it as a safer choice. *See Primal Vantage*, *Co., Inc.*, 677 S.W.3d at 249–50.

42

Moreover, 3M ignores the real crux of the Kentucky Supreme Court's decision: "[W]hile there was evidence that chains could conceivably be used as an alternative method of affixing a ladderstand to a tree, . . . a reasonable person could not believe that chains were a *safer*, practical alternative to the use of polypropylene straps." *Primal Vantage Co., Inc.*, 677 S.W.3d at 250 (emphasis added). The court's fundamental issue was with the plaintiff's failure to prove "that chains were a safer or practical alternative to straps, especially where other evidence suggested that the use of chains presented its own safety concerns." *Id.* Here, the evidence of the elastomeric respirator's increased safety benefits is well grounded in the record. The present case is much more analogous to *Garlock Sealing Technologies, LLC v. Robertson*, No. 2009-CA-483-MR, 2011 WL 1811683, at *2–3 (Ky. Ct. App. May 13, 2011), where the court concluded that an alternative product available at the time of the appellant's exposure was a reasonably safer alternative because it targeted a similar market and had legitimate safety benefits—all despite the appellee's efforts "to cast th[e] alternative product in a different light." *Cf. Smith*, 2021 WL 4098408, at *5 (finding that an alternative mesh which differed in density, weight, and size amounted to a reasonably safer alternative design, while ultimately granting summary judgment after determining that it was only theoretically feasible).

3M rejects as an alternative design an overlapping product of "fundamentally different design." *See* DE 119 at 5. That is difficult hair-splitting in this context and ignores the jury's role. Plaintiffs offer a design that, per their theory, addresses the shortcomings of the 3M 8710 and 3M 8210 by improving submicron filtration, incorporating a valve to enhance function, increasing frame durability, and providing a superior and enduring seal that can be readily fit checked and tested. *See* DE 111 at 7–9. Price substantiates the points over 50 pages and reports that such a product is, in fact, in the market, *see* DE 96-1 at 45–46, and the record strongly supports that

miners have used and mines have supplied the basic type of respirator Price touts, *see* DE 99-4 at 14. Indeed, MSHA's 2024 crystalline silica rule indicates that some of these design variations are the keys to separating acceptable from unacceptable in the field of mining respiration. This is enough. Recall, the query is whether there is "no evidence of probative value to support that there was 'an alternative safer design, practicable under the circumstances.'" *Primal Vantage, Co., Inc.*, 677 S.W.3d at 248 (quoting *Trent*, 2 F. Supp. 3d at 1026). Phrased differently, "'some evidence that would incline a reasonable person to believe' an alternative, safer design practical under the relevant circumstances existed." *See id.* at 249 (quoting *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 285 (Ky. 2014)). Kentucky views the requirement as one to show "some alternative way of manufacture or design . . . both safer and feasible." *Ford Motor Co. v. Fulkerson*, 812 S.W.2d 119, 126 (Ky. 1991). The elastomeric respirator option surely is one a jury could treat as an "alternative way of manufacture or design" for a mining respirator.

Plaintiffs have advanced an alternative design for the 3M 8710 and 3M 8210 respirators that, at least plausibly, is both safe and practical. Of course, 3M might be correct; mine operators might be unwilling to purchase Price's elastomeric respirators. *See* DE 119 at 5–6. However, that question—at least, on the present facts—must be left to the jury. *See Anderson*, 106 S. Ct. at 2511. Plaintiffs are not suggesting that the metaphorical "motorcycle could be made safer by adding two additional wheels and a cab." *See* DE 94 at 12 (quoting *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 385 (Tex. 1995)). The fact that Price has put forward a comparable design that avoids known FFR testing, structural, and filtration pitfalls is sufficient to inform the risk-utility sorting called for in Kentucky product liability cases.

In a last-ditch effort, 3M also argues that summary judgment is warranted on Plaintiffs' product liability and negligence claims because Blackburn was not fit tested. *See* DE 94 at 14.

44

That claim is addressed in more detail below and ultimately denied. *See supra* Part III.B.2. The Court further notes that Plaintiffs' product liability and negligence claims are premised on more theories than inadequate fit alone. As a result, the Court concludes that granting 3M's requested relief would be improper at this stage.

### 2. Fit Defect Theory

Second, 3M contends that Plaintiffs lack evidence of specific causation with respect to their fit defect theory. *See* DE 94 at 15. In particular, while Price asserts that the 3M 8710 and 3M 8210 respirators "are defectively designed because they do not achieve a fit factor of at least 100 at the lower fifth percentile," he fails to establish that those respirators poorly fit Blackburn himself. *See id.* In 3M's view, Plaintiffs' inability to establish specific causation defeats their defective fit claims. To the Court, however, it seems that 3M misunderstands the specific causation inquiry and Plaintiffs' theory. While specific causation must be established for a toxic tort claim, that inquiry, as earlier noted, is premised on whether "a given exposure is the cause of a particular individual's disease." *Burton v. CSX Transp., Inc.*, 269 S.W.3d 1, 8 n.19 (Ky. 2008) (quoting *Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 471 (M.D.N.C. 2006)). Blackburn has undoubtedly offered sufficient evidence for a reasonable juror to conclude that his exposure to coal and silica dust caused his CWP.

Regarding 3M's role in causing Blackburn's disease, the typical principles of legal causation pertain: Plaintiffs must prove that 3M played a substantial role in causing their injuries. *See Cardinal Indus. Insulation Co., Inc. v. Norris*, Nos. 2004-CA-525-MR, 2004-CA-575-MR, & 2004-CA-645-MR, 2009 WL 562614, at *5–7 (Ky. Ct. App. Mar. 6, 2009) (applying substantial factor test and traditional principles of legal causation to an asbestos defendant while also noting that a "lack of expert testimony . . . [was] not necessarily fatal to plaintiff's claims.").

To be sure, Plaintiffs' fit defect theory is relatively individualized—instead of alleging that the 3M 8710 and 3M 8210 respirators provided inadequate protection in the abstract, Plaintiffs are suggesting that the design of the respirators made it difficult for Blackburn to achieve or maintain an adequate face seal, thereby permitting particulate leakage during respirator use. *See* DE 96-1 at 15–22. But the absence of individualized fit testing does not, on this record, entitle 3M to summary judgment. That is, Kentucky law does not invariably require plaintiffs to produce product-specific, individualized measurements. *See CertainTeed Corp.*, 330 S.W.3d at 77 Instead, the question is whether there is sufficient evidence for a reasonable juror to conclude that a defect in the 3M 8710 and 3M 8210 respirators more probably contributed to the particulate exposure that resulted in Blackburn's disease. *See id.*

On the present record, Plaintiffs have offered adequate support. In claiming that 3M's respirators suffer from fit-related design deficiencies, Price relies on 3M's internal data and related materials suggesting that a statistically significant portion of respirator wearers fail to achieve adequate fit factors. *See* DE 96-1 at 15–22. Price establishes that FFRs, unlike elastomeric respirators, are particularly vulnerable to face seal leakage. *See id.* at 45–46. And indeed, 3M itself has recognized the importance of face seal integrity, noting that coal and silica dust particulates will take the path of least resistance and enter through face seal leaks. *See id.* at 11. Thus, the alleged face seal defects are not unique to Blackburn's face. Rather, they reflect recurring design problems that increased face seal leakage for a defined group of users. That proof is sufficient for a reasonable juror to infer that Blackburn—who wore the 3M 8710 and 3M 8210 respirators throughout his career—was exposed to coal and silica dust due to defective fits, and that the resulting exposure from those defective fits played a substantial role in causing his disease. *See Anderson*, 106 S. Ct. at 2511. Indeed, given Price's criticism over the ability to fit test the 3M

46

FFR masks, and 3M's data that support Price's views regarding overall fit performance across the 3M 8710 and 3M 8210 product periods, Plaintiffs have raised a question over whether the product simply does not fit at the level a reasonable consumer would expect for this safety product, thus indicating defect.

While it is true that Price was unable to say with certainty what Blackburn's fit factor would have been on any given occasion, *see* DE 96-5 at 39–40, that fact does not eliminate the reasonable inferences arising from Plaintiffs' fit evidence, especially given the noted difficulties associated with accurately assessing fit. And as a practical matter, the Court emphasizes that 3M's position would seem to necessarily require individualized fit testing data—often from decades prior—for *any* respirator that allegedly failed to form an adequate face seal. No such proof requirement exists under Kentucky law. It would be ironic to inexorably require fit data for a product that, in one view, cannot be meaningfully tested and has generated inferior fit proof, even to the manufacturer itself, over time.

Although some of 3M's criticisms of the fifth percentile benchmark may be valid, the Court does not view the evidence in isolation, particularly because Plaintiffs have paired it with Blackburn's long-term use of the respirators at issue, *see* DE 94-1 at 8, and the medical proof of his CWP, *see* DE 107-1 at 13–14. Further, Price's report is replete with examples of 3M itself focusing on the masks' fit factor performance relative to that percentile. Price's view seems, as viewed in this context, properly built on a metric 3M values, using targets informed by 3M's product aspirations. The Court would not exclude such proof from jury consideration.

And really, Plaintiffs' fit factor theory is just one segment of their broader product liability and negligence claims, which collectively assert that Blackburn was not provided with respirators that could capably filter coal and silica dust in the underground mining context. The Court will

not parse each individual proof theory underlying these claims. 3M remains free to argue that Plaintiffs' fit evidence is imprecise and that generalized population statistics should not be used to draw conclusions about Blackburn's fit. But those arguments must be made to the jury. *See Ind. Ins. Co.*, 326 F. Supp. 2d at 846. As such, the Court denies summary judgment for 3M with respect to Plaintiffs' fit defect evidence.

### 3. Manufacturing Defect Theory

Third, 3M claims that Plaintiffs cannot prove a manufacturing defect . . . in the" 3M 8710 and 3M 8210 respirators. *See* DE 94 at 16. 3M is correct. Under Kentucky law, a manufacturing defect exists when "a deviation from the product's design . . . creates an unreasonable risk of harm." *Wright v. Gen. Elec. Co.*, 242 S.W.3d 674, 682 (Ky. Ct. App. 2007) (citing *Edwards v. Hop Sin, Inc.*, 140 S.W.3d 13, 15 (Ky. Ct. App. 2003)). In contrast, a design defect exists when a particular design "selected by the manufacturer amounted to a defective condition which was unreasonably dangerous." *Nichols v. Union Underwear Co., Inc.*, 602 S.W.2d 429, 433 (Ky. 1980).

Plaintiffs spend much of their response referring to Price's report, emphasizing his conclusion that 3M failed to comply with the pressure drop certification test for at least the 3M 8710 respirator. *See* DE 111 at 10–11. They also highlight 3M's decision to "modify its testing equipment by installing a drying system to control humidity in the silica dust testing equipment," purportedly allowing for the manipulation of test results. *See id.* at 11–15. Plaintiffs' arguments reveal a fundamental misunderstanding as to what a manufacturing defect claim entails. Nowhere do Plaintiffs allege that the specific respirators Blackburn used deviated from their intended designs—the critical element of that claim. The fact that Price labeled a portion of his report "manufacturing defects" does nothing to alter that conclusion. *See* DE 96-1 at 24–35. To

48

the extent Plaintiffs argue that the respirator designs selected by 3M amounted to defective and unreasonably dangerous conditions, they are bringing design defect claims. *See Nichols*, 602 S.W.2d at 433. Accordingly, the Court grants summary judgment for 3M with respect to Plaintiffs' manufacturing defect claims. The testing proof may be relevant in the case as to 3M's knowledge and product condition. But the proof does not establish a manufacturing defect, as the law expresses that concept.

### 4. Inadequate Warnings and Instructions Theory

And finally, 3M argues that Plaintiffs have failed to produce sufficient evidence to prevail on their inadequate warnings and instructions theory. *See* DE 94 at 18–20. In particular, 3M alleges that Plaintiffs' warning-based theory cannot survive Blackburn's admitted failure to read the warnings, *see id.* at 18, that Plaintiffs' instruction-based theory is defeated by the adequacy of the instructions, *see id.*, and that Plaintiffs lack crucial testimony from a human factors expert, *see id.* at 19–20.[20]

The Court first addresses Blackburn's alleged failure to read 3M's warnings. 3M specifically cites testimony in which Blackburn stated that he did not recall reading any warnings on the respirators he used. *See* DE 94-1 at 15–16. Plaintiffs, however, identify separate testimony suggesting that Blackburn read 3M's packaging and specifically remembered a statement that "sa[id] the product provide[d] [10] times protection." *See* DE 111-16 (Blackburn Deposition

---

[20] 3M also argues that Plaintiffs are attempting to impermissibly repackage their design defect theory as a warnings and instructions theory. *See* DE 96 at 18–19. The Court agrees that design defect theories and warnings and instructions theories can be distinct. *See Willis v. Abbott Lab'ys*, No. 1:15-CV-57, 2017 WL 5988215, at *10 (W.D. Ky. Dec. 1, 2017). *Primal Vantage* attempted to draw lines between these associated concepts. In most cases, a degree of factual overlap will necessarily exist between the two theories, and the Court sees no reason to grant summary judgment for 3M based on the similarity of these theories alone. *Primal Vantage* plainly endorsed negligent and strict liability failure to warn theories and noted the linkage between a design defect and persisting "defectiveness" by virtue of inadequate warning. *See* 677 S.W.3d at 246. The Court will sort that out in instructions. 3M's other critiques are addressed in full.

49

Excerpt II) at 3. Construing this evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that, during his examination of 3M's packaging, Blackburn also may or would have reviewed warnings and instructions. While it is certainly accurate that Blackburn's failure to read any of 3M's warnings could have a direct bearing on whether 3M "proximately caused the injury," there is a dispute of material fact as to whether Blackburn actually read any warnings and product literature. *See Shea v. Bombardier Recreational Prods., Inc.*, No. 2011-CA-999-MR, 2012 WL 4839527, at *3 (Ky. Ct. App. Oct. 12, 2012); *see also Celotex Corp.*, 106 S. Ct. at 2552–53. That dispute, like all legitimate factual disputes, is properly left for the jury. *See Anderson*, 106 S. Ct. at 2511. There is not proof that Blackburn eschewed a chance to read safety materials, instructions, or warnings, so the course of trial will resolve this topic.

3M's argument about the adequacy of its instructions fares no better. Certainly, if the 3M 8710 and 3M 8210 respirators were "accompanied by adequate instructions," Plaintiffs' theory might fail. *See Worldwide Equip., Inc. v. Mullins*, 11 S.W.3d 50, 55 (Ky. 1999) (quoting *Ulrich v. Kasco Abrasives Co.*, 532 S.W.2d 197, 200 (Ky. 1976)). Indeed, 3M has presented expert testimony indicating that "[t]he instructions present were sufficient for Mr. Blackburn to understand how to don and fit check the respirators and for him to understand the purpose for proper fit." *See* DE 81-5 (Arndt Report) at 43. Plaintiffs, however, have presented testimony from Price asserting that "3M . . . had actual knowledge that its fit check donning instructions and procedures were ineffective in allowing the user to determine an adequate fit," and that "[t]he ineffective user instructions . . . allow[ed] users to wear . . . mask[s] that did not properly fit." *See* DE 96-1 at 13. With respect to 3M's warnings, Price claims 3M should have warned "that it was difficult or impossible to properly perform a user seal check," "that the 3M 8710 did not pass the federal certification test," "that the 3M 8710 would likely fail after 15–30 minutes of use," and

50

"that [3M's] mask should not be used around silica dust." *See id.* at 43. Collectively, this testimony creates disputes of material fact. *See Anderson*, 106 S. Ct. at 2511.

Last, the mere fact that Plaintiffs failed to retain a human factors expert is not determinative under Kentucky law. To be sure, 3M is correct in claiming that human factors experts can often assist with "analyz[ing] the adequacy of warnings and instructions accompanying a product." *See* DE 94 at 19 (citing *Yonts v. Easton Tech. Prods., Inc.*, 676 F. App'x 413, 418–20 (6th Cir. 2017); *Stewart v. Gen. Motors Corp.*, 222 F. Supp. 2d 845, 849 (E.D. Ky. 2002)). However, the Court sees no basis to (or law requiring a court to) treat such testimony as an absolute prerequisite, particularly given the fact that industrial hygienists like Price are more than equipped to put 3M's missing warnings and instructions "in context with a thorough understanding of the underlying risk."[21] *See Yonts*, 676 F. App'x at 418. Plaintiffs have provided sufficient evidence to support their theory, even without a human factors expert. Indeed, presumably any warning would need to be designed to effectively communicate instructions and limitations to a lay audience—precisely what the jury will be.

And to the extent Kentucky courts recognize the heeding presumption, the Court notes that Plaintiffs are probably not required to produce *any* expert testimony regarding absent warnings and instructions. *See Snawder v. Cohen*, 749 F. Supp. 1473, 1479–80 (W.D. Ky. 1990) ("Where there is no warning, the presumption that the consumer would have heeded an adequate warning works in favor of the plaintiff unless rebutted by the manufacturer. . . . Although this Court can find no Kentucky case which affirmatively applies this presumption, . . . [it] would be followed by the Kentucky courts."); *see also Montgomery Elevator Co. v. McCullough ex rel. McCullough*,

---

[21] And in fact,, the Court notes that the Sixth Circuit affirmed exclusion of the human factors expert in the quoted case, finding that she lacked sufficient industry knowledge to put the underlying risk in context. *Yonts*, 676 F. App'x at 418.

676 S.W.2d 776, 782 (Ky. 1984) ("[A]dequate warning may terminate liability as to those who get the warning.   But it has no effect on those who do not get the warning except in extraordinary circumstances . . . .").

IV.    CONCLUSION

Accordingly, the Court ORDERS as follows, simply as a summary of this plenary ruling:

1.  The Court GRANTS DE 94 in part.

    a.  3M is entitled to summary judgment on Plaintiffs' manufacturing defect theory and breach of warranty claim.

    b.  The other theories supporting Plaintiffs' product liability and negligence claims persist, as do Plaintiffs' punitive damages and loss of consortium claims.

2.  The Court GRANTS DE 95 in part.

    a.  Any of Harris's opinions regarding respiratory protection products and causation are excluded.

3.  The Court GRANTS DE 96 in part.

    a.  Any of Price's efforts to quote directly from Coffey and Johnson are excluded.

4.  The Court GRANTS DE 97 on terms.

    a.  Any of Spadaro's opinions concerning the design and suitability of respirators are excluded.

5.  The Court GRANTS DE 98 on terms.

    a.  Any of Crum's testimony regarding respirators, respirator defects, and mining practices is excluded.

52

b. Any of Crum's opinions attributing Blackburn's illness to exposure that occurred because of wearing 3M respirators or otherwise tying his disease to the performance of those respirators are excluded.

c. Any of Crum's opinions relating to the progression and cause of Blackburn's condition that exceed the scope of his report are excluded.

6. The Court GRANTS DE 99 in part.

a. Any of Weiss's opinions on the specific medical cause of Blackburn's disease or on the specific cause or mechanics of CWP more generally are excluded.

b. Weiss's opinion that any mine worker who contracts CWP was necessarily exposed to levels of dust that exceeded mandatory limitations is excluded.

c. Any of Weiss's testimony regarding the ultimate liability of Blackburn's employers is excluded, though he may opine regarding safety duties.

7. The Court DENIES DE 101.

This the 27th day of June, 2026.

**Signed By:**

_Robert E. Wier_

**United States District Judge**